## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **JESSICA MAYHEW,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| **ABBOTT LABORATORIES, INC.,** | ) | |
| | ) | |
| Defendant | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jessica Mayhew ("Plaintiff" or "Mayhew"), by and through undersigned counsel, hereby complains against Defendant Abbott Laboratories, Inc. ("Defendant" or "Abbott"), as follows:

## JURISDICTION AND PARTIES

1.     This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551 *et seq,* and the Maine Whistleblower Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq.*

2.     Plaintiff Mayhew is a United States citizen residing in the Town of Minot, County of Androscoggin, and State of Maine.

3.     Defendant Abbott is a multinational medical devices and health care company with headquarters in Chicago with locations throughout the United States including in Scarborough, Maine. Abbott is a corporation duly authorized to do business in

the State of Maine, operating human specimen laboratories in various locations, with its main campus located in Scarborough, Maine, where Plaintiff worked.

4.    Mayhew worked for Abbott as a Quality Assurance Specialist.

5.    At all times herein relevant, Plaintiff was an "employee" of Abbott as that term is defined under the ADA and the MHRA.

6.    Defendant has over one hundred thousand employees.

7.    This Court has subject matter jurisdiction over Mayhew's claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

8.    Plaintiff filed a timely Charge of Discrimination against Defendant with the Maine Human Rights Commission ("MHRC"), alleging that Defendant subjected her to unlawful disability discrimination and retaliation.

9.    On December 3, 2025, the MHRC issued a Notice of Right to Sue letter pursuant to 5 M.R.S. § 4621.

## FACTUAL ALLEGATIONS

10.    Mayhew began working for Abbott on May 15, 2020 as a Quality Assurance Specialist in Scarborough, Maine.

11.    Mayhew suffers from PTSD, anxiety, and syncope.

12.    During the first two weeks of her employment she was onsite daily training under her direct supervisor, John Humpage ("Humpage"). However, the training was all virtual through remote platforms.

13.    During the training Mayhew informed Humpage of her syncope causing her to unexpectedly faint or pass out. Mayhew informed Humpage that when she felt like she might faint she would lay on the ground and not to call an ambulance as she

would recover within 15-20 minutes. Mayhew also did not want people crowding around her during the pandemic.

14.    Mayhew and Humpage agreed that if she wasn't feeling well she could lay down in the conference room.

15.    Approximately 90% of the employees were working from home therefore many of the conference rooms were not utilized and available.

16.    At the time, Mayhew's anxiety and PTSD were recently exacerbated by an attack from her therapist when he suffered from a mental break during a therapy session.

17.    The increased anxiety causes Mayhew to faint more frequently and interferes with her sleep, eating and ability to concentrate.

18.    On May 13, 2021, Mayhew felt her blood pressure drop so she laid down in a conference room and sent a text to Humpage.

19.    During the Spring and Summer of 2021, Mayhew often experienced heightened anxiety when colleagues suddenly approached her work station from behind causing a heightened startle response. When this occurred, Mayhew experienced a strong startle response and rush of adrenaline. Her instinct was to defend herself because in the past she was injured by an individual who approached her from behind.

20.    On August 9, 2021, Mayhew had an appointment with her PCP who wrote a request for accommodation stating that Mayhew needed to work remotely four days per week. Mayhew submitted the documentation to Human Resources.

21.    On August 19, 2021, Mayhew asked a coworker, Paduymna, if he would consider swapping desks after Humpage suggested she do so. In response, he laughed shaking his head and said "No way—you're near the boss and done come in as often as me."

22.    Mayhew explained that she wanted to change desks because of her strong adverse reaction when approached from behind, the effects of which lasted long after the initial incident. She also communicated that it was a serious health concern because in the past she had been physically hurt by someone approaching her from behind. In response he laughed again and said, "No, I am not willing to switch desks with you."

23.    On August 23, 2021, Mayhew left two voicemails with Nitorshi Wilson, Human Resources Case Manager.

24.    On the same day, Humpage asked Mayhew about the status of her request for accommodation. Mayhew explained that she was trying to follow up with Nitorshi but hadn't heard anything from her.

25.    Later the same day, Nitorshi returned Mayhew's call and the conversation lasted under a half hour. Nitorshi stated that she had Mayhew's medical information in front of her, but the documentation was not sufficient evidence of a need for accommodation.

26.    The tone of the conversation was condescending at times and Mayhew was cut off or interrupted by Nitorshi often.

27.    Nitorshi stated, "We need to be very clear so I will ask you again, do you need a flex schedule or a medical accommodation." Mayhew did not understand the distinction and asked her to clarify, but Nitorshi did not.

28.    Nitorshi recommended noise canceling headphones to decrease the noise. Mayhew responded explaining that the headphones would only increase the chances of being startled by someone approaching from behind. Therefore, Nitorshi recommended also placing an orange flag at Mayhew's desk so that people could wave it at her when they wanted her attention.

29.    Nitorshi next suggested changing the desk configuration.

30.    Mayhew explained to Nitorshi that she had spoken with Kathryn, a physical therapist with Abbott about such alternatives. Nitorshi laughed at Mayhew and stated "How does that make sense to consult a physical therapist for this type of work? This is a function of employee health and safety or facilities - not a physical therapist."

31.    Mayhew provided that Kathryn had helped her obtain a sit/stand desk earlier and this time Kathryn came to Mayhew's desk to discuss the concern, and emailed facilities with Mayhew cc'd to inquire about what types of desks are available in the warehouse. Kathyrn and Mayhew talked about possibly putting a mirror on her cubicle so she could see individuals approaching from behind but decided in the end it would not be a good solution for Mayhew because her desk is in a high traffic area causing unnecessary distraction and the shadows make her nervous. Kathryn and Mayhew discussed desk location alternatives. Mayhew showed her where other

team members sit. Together Kathryn and Mayhew identified the best desk location alternative - Praduymna's desk - which is not in a high traffic area like Mayhew's. Mayhew's desk is next to the bathrooms, lunchroom, and printer. His desk is in a corner with his back to the windows.

32.    Mayhew explained that after this meeting she asked Praduymna to switch desks with her.

33.    Nitorshi cut Mayhew off stating it was illegal to do so and not to do it again in the future because that is a role for HR or management. She asked if Mayhew initiated the conversation herself.

34.    Mayhew remembered Humpage asked her not to mention that he had recommended she ask Pradyumna about switching desks so she did not reveal that information.

35.    Nitorshi and Mayhew then discussed her fainting condition. Mayhew explained that she had a service dog at home—to which Nitorshi interrupted Mayhew and said "you mean emotional support dog." Mayhew clarified that it was not an emotional support dog, but a trained service dog that was able to sense when she was going to faint and alert her beforehand so that she could be in a safe place. Mayhew explained that previously she was going into the conference rooms when she felt faint, but that they were now often in use and having to lay down flat was drawing a lot of attention to her by people working in the area. Nitorshi suggested placing a cot under her desk.

36.    Nitorshi was very dismissive and Mayhew could tell she was not taking the request for accommodation seriously.

37.    Mayhew spoke with Humpage after the call and told him how disappointed she was. He responded "It's probably not professional of me to say this, but I don't like her very much anymore. If we have to, we will handle this at a local level. It will be alright Jess."

38. On September 3, 2021, Mayhew saw her PCP for additional documentation because Nitorshi said the prior letter was insufficient despite the occupational health nurse, Sheila Roy, stating the letter was sufficient.

39. On October 25, 2021, Mayhew received a text from a colleague, Jennifer Campinell, indicating that a door was installed on her cubicle. Campinell didn't want Mayhew to be surprised when she returned from her honeymoon.

40. On November 2, 2021, Mayhew met with Sheila Roy. Roy provided Mayhew with documentation stating they are unable to accommodate working remotely four days a week, per the request from her PCP, and other accommodation is fair and reasonable.

41. On November 12, 2021, Mayhew and coworker, Bret Stuart, were yelled at openly during a senior leadership meeting for allegedly not being aligned with their leader. However, Director Mary Kluck had circulated new priorities to leadership without copying the team, therefore they were unaware of the new priorities being implemented.

42. On November 18, 2021, Humpage loudly yelled Mayhew's name in the office causing her to jump and feel panic. He apologized, realizing his actions scared her. Later that day she had a meeting with him and shared that he is often condescending and reprimands employees for being proactive.

43. On November 30, 2021, Mayhew participated in an online seminar describing how different Abbott locations acclimated during the pandemic. One site highlighted by Abbott during the presentation was in the Asia Pacific, where the employees had to decide within 24 hours if they wanted to camp at Abbott for the foreseeable future while the country shut down or if they wanted to go home. They showed pictures of cots set up with bug nets in what looked like a parking garage where employees ate, slept, and worked. The speaker described the experience as "a level of commitment we expect from all our employees."

44. On December 6, 2021, Humpage outlined his team in groups of two so that there was overlap with vacations and sick time. Vamshi and Pradyumna were a group focused on lateral flow products. Bret and Mayhew were a group focused on ID NOW products and customer complaints. Whenever Mayhew requested time off, Humpage asked Mayhew to coordinate within her group to secure coverage of the product group. On this day in particular Humpage mandated Bret and Mayhew cover for the lateral flow group so they could both be out on vacation at the same time. This occurred twice in a one-month period. This is an example of how Humpage's rules change depending on the person.

45. Another example of the disparate treatment is shown by the flexibility with other colleagues and their permission to work from home multiple days per week even though it is against corporate policy

    a. Vamshi works Sunday to Thursday. He is allowed to work from home two days a week (Sunday and one day Monday to Thursday).

    b. Pradyumna works Tuesday to Saturday. He is allowed to work from home two days a week (Saturday and one day Tuesday to Friday).

    c. After Mayhew's seat was changed, she noticed Pradyumna would often work from home 3-4 days a week, and the days he showed up in the office he came in around 10am. Humpage had an expectation that Mayhew be in the office and logged in around 8am. There were multiple times when Mayhew was on vacation where Humpage repeatedly called her on Teams and her cell phone demanding to know why she wasn't logged on by 9am. He always apologized for his behavior afterwards. The excessive calling made Mayhew feel guilty for taking time off since she knew he was calling to give her an urgent task or project and caused stressed during her vacation as she knew returning to work would result in urgent tasks she would be behind in because of taking time off.

46. On December 10, 2021, Nitorshi stated the employee relations case regarding Mayhew's request for accommodation would close.

47. On December 30, 2021, Mayhew submitted another letter from her PCP requesting accommodations to work remotely.

48. On January 4, 2022, Mayhew met with Humpage regarding issues that she felt were disregarded.

    a. Mayhew was tasked with remediating complaint quality incidents because they are messy, need a very detailed thinker, and a process needs to be created and implemented. Humpage believed she was the best person on the team with this skill set so she took it on. During this meeting one of the 5 examples he asked me two to three times per week for the past 2 months was what her roadblocks are for completing these complaint quality incidents because he wants them done now. Mayhew reminded him time and time again that because the process keeps changing from leadership and other stakeholders, this causes Mayhew and people on her team to rework these quality incidents over and over again. Each time they rework them, Humpage assured them that it will be the last time they would have to rework them but this is the 3rd time and it seems like it never ends.

    b. Medical accommodation: The door was installed without consulting Mayhew and is being perceived as working well. It's not working well. Mayhew expressed her concerns multiple times and each time she is told to give it a little more time before Abbott can make a decision. If Mayhew expresses frustration with her caseworker she is told that she

10

might be having a bad day or have some patience. Mayhew told Humpage "I understand I'm not being blunt about how much pain I am in and therefore may come across as fine, but I'm not fine."

c.  I was very clear when you asked me if I had time to complete the tracking and trending presentation, I said no. You interrupted me and talked over me telling me how I do have time. I was so frustrated with you I left the room. His response, "oh I didn't even notice".

d.  The Hunter situation - I felt as though you didn't believe me and I should tolerate his behavior of calling me stupid because it is in the best interest of the company.

e.  The lateral flow product transfer team is, as you know, really difficult to work with. They are abrasive and dismissive. When I expressed concerns about their inability to receive feedback, it was met with a shrug and an "I know that's just who they are " response instead of a proposed solution.

49.    On January 13, 2022, there was a Complaint QI meeting where the process was discussed and changed for processing Abbott Covid rapid test products with physical defects, false positive, false negative, and invalid results. Abbott forced Mayhew to change the risk assessment and ultimately allow more defective products onto market. The product incident rates exceeded the threshold.

50.     On January 15, 2022, Mayhew received an email from a female colleague, Melissa Watson, indicating she was terminated for being transgender and non-binary. She included in the email "Mental Health Matters. Don't let management decide otherwise." She also provided a LinkedIn post where she described needing time off for depression, but was fired without warning.

51.     On January 26, 2021, Mayhew spoke to a colleague, Jennifer Campinell about the night terrors she was having related to work.

52.     Early February of 2022, Humpage assigned Mayhew many additional tasks such as to perform redlines on procedures regarding complaint quality incidents, assist session project timeline, track and trend action items, and to attend a "train the trainer" week long class. These were all expected to be performed in addition to her full-time duties.

53.     On February 7, 2022, Mayhew received a newsletter announcing Abbott hired a Remote Quality Specialist, showing the Quality Department at Abbott does and can allow employees to work remotely.

54.     On February 18, 2022, Humpage requested that Mayhew take on an additional assignment. Mayhew told him she couldn't do the new assignment and complete the tracking and trending project. He responded "You need to do both. Get it done."

55.     On March 3, 2022, Mayhew received her annual performance evaluation. Humpage provided on the fifth bullet point "I want to thank you on

behalf of the company for your dedication and support as I know this posed a great risk to both your mental and physical health." He left the "areas for improvement" blank and yet gave Mayhew "achieves expectations." Mayhew's colleague, Bret Stuart was rated as "exceeds expectations." Mayhew believes this is another example of being treated differently and adversely because of her disability and request for accommodation.

56. On March 4, 2022, Mayhew had a meeting with Humpage in which he expressed interest in considering Mayhew for a promotion to a supervisory position, but worried her mental health would be a barrier for being successful in the new position.

57. On March 18, 2022, Mayhew had a discussion with Director of Quality for Lateral Flow products regarding how they will justify in their Health Hazard Evaluation and Field Corrective Action forms not keeping inspection forms for desiccant lots before releasing product. The desiccant lots were received in the warehouse September to November 2020 and Abbott likely distributed product out in the field without being inspected.

58. On March 22, 2022, Mayhew created a Matrix Services account for the disability firm hired by Abbott to ensure she had the appropriate paperwork submitted for her medical appointments.

59. On March 24, 2022, Mayhew met with her PCP to discuss her poor health and what to do moving forward. After explaining her situation, he told

Mayhew "I really wish you could quit. This job is greatly affecting your health. I completely support you taking a short-term disability." He was not sure if Mayhew's claim would be approved. He suggested Mayhew reach out to her psychiatrist, Dr. Rosalind Gold, as he had taken another job and would be leaving in 3 weeks. He also stated Mayhew might more success getting Abbott to regard mental health seriously if it is sent by her psychiatrist.

60. On March 28, 2022, Mayhew met with Dr. Gold. Mayhew described deteriorating work conditions and excessive workload. Mayhew expressed that she is exhausted but can't sleep, getting 3-4 hours of sleep. Mayhew also described worsening OCD tendencies.

61. On March 29, 2022, Mayhew received a request from Matrix Services to upload information so they could process her request for STD.

62. Mayhew began STD leave April of 2022 because of her worsening anxiety, depression and overall mental health. Throughout April, May and June of 2022, Mayhew was treated by Dr. Gold and her new PCP, Katlyn Breton.

63. On June 3, 2022, Mayhew sent an email of her resignation to Abbott.

64. On June 14, 2022, Humpage asked Mayhew to schedule time to meet with him to discuss her return to work. Mayhew replied stating that she sent her resignation 11 days prior.

65. Abbott discriminated against Mayhew based on her disability.

66.     Mayhew's anxiety, depression, PTSD, and syncope amount to a disability under the ADA and MHRA.

67.     Throughout the time that she suffered from this disability, Abbott treated Mayhew in a discriminatory and retaliatory manner, criticizing her work performance, rating her lower than her peers despite good work product and taking on additional duties, and not considering Mayhew for a promotion because of her disability.

68.     Abbott regarded Mayhew as disabled in violation of the ADA and MHRA.

69.     Abbott retaliated against Mayhew for needing to take time off for treatment and requesting an accommodation.

70.     Abbott failed to accommodate Mayhew by requiring she work in person as opposed to remotely despite the ability to do so for other not disabled employees.

71.     Abbott took adverse action against Mayhew in violation of the ADA and MHRA by stating they would not promote Mayhew because of her disability.

72.     Abbott discriminated against Mayhew in violation of the ADA and MHRA by stating her disability was not real.

73.     Before going out on leave from Abbot, Mayhew was still attending appointments for her disability and reengaged in the interactive process by requesting accommodation again on March 24, 2022.

74.     Mayhew believes that Abbott treated her differently because of her disability.

75.    Mayhew also believes she was retaliated against and assigned additional work for trying to maintain Quality standards that would prevent defective Covid tests from entering the marketplace, but was met with opposition.

76.    Mayhew also observed abhorrent working conditions of individuals working on the production line putting Covid tests together. Abbott employees referred to the production facility in Westbrook as "Wild Wild Westbrook" because of the dehumanizing conditions employees were required to work under.

77.    Mayhew was constructively discharged from her position with Abbott because of its failure to accommodate her disability and engage in the interactive process in good faith.

78.    Abbott refused to provide the accommodations Mayhew requested and did not take the disability and related restrictions seriously.

79.    The essential functions of Mayhew's position with Abbott could have been performed successfully with the restrictions outlined by her medical provider.

80.    Abbott knowingly and willfully violated Mayhew's state and federally protected rights.

## COUNT I – DISABILITY DISCRIMINATION UNDER THE ADA
### (42 U.S.C. § 12101 *et seq.*)

81.    Plaintiff repeats the allegations contained in Paragraphs 1 through 80 of the Complaint as if fully set forth herein.

82.    At all times herein relevant, Mayhew was a qualified individual with a disability within the meaning of the ADA.

83.     Defendant engaged in unlawful disability discrimination against Mayhew in violation of the ADA.

84.     Defendant's stated reasons for changing refusing to provide appropriate and effective accommodations for Mayhew were pretext for disability discrimination.

85.     Defendant regarded Mayhew as being disabled.

86.     Mayhew has a record of a disability.

87.     Defendant failed to engage in the appropriate, goodfaith interactive process with Mayhew.

88.     Defendant failed to provide Mayhew with the reasonable accommodations that were necessary for her disability in order to perform the essential functions of her job.

89.     As a result of Defendant's discriminatory actions, Mayhew has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Jessica Mayhew requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – RETALIATION UNDER THE ADA
### (42 U.S.C. § 12101 *et seq.*)

90.     Plaintiff repeats the allegations contained in Paragraphs 1 through 89 of the Complaint as if fully stated herein.

91.    Throughout her employment, Defendant retaliated against Mayhew for requesting accommodations for her disability.

92.    Defendant took adverse action against Mayhew for exercising her protected rights under the ADA.

93.    As a result of Defendant's retaliatory actions, Mayhew has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Jennifer Mayhew requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT III – VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5 M.R.S. § 4571 *et seq.*)

94.    Plaintiff repeats the allegations contained in Paragraphs 1 through 93 as if fully stated herein.

95.    For all of the reasons set forth in Count I above, unlawful discrimination against Plaintiff has taken place within the meaning of the Maine Human Rights Act.

96.    For all of the reasons set forth in Count II above, unlawful retaliation against Plaintiff has taken place within the meaning of the Maine Human Rights Act.

WHEREFORE, Plaintiff Jessica Mayhew requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, liquidated

damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### COUNT IV – VIOLATION OF THE MAINE WHISTLEBLOWER PROTECTION ACT
### (26 M.R.S. § 831 *et seq.*)

97.    Plaintiff repeats the allegations contained in Paragraphs 1 through 96 as if fully stated herein.

98.    Mayhew engaged in protected activity within the meaning of the Maine Whistleblower Protection Act by opposing and complaining of Abbott placing nonconforming product into commerce against regulation and decreasing the efficacy of national and global safety efforts to reduce the spread of Covid via home testing during the peak of the pandemic.

99.    Mayhew engaged in the aforementioned protected activity in good faith.

100.    Abbott took adverse action against Mayhew because of her protected whistleblower activity by refusing to provide reasonable accommodations, refusing to promote her, rating her lower than her coworkers and treating her with disdain and harassment whereby exacerbating her anxiety symptoms.

101.    The aforementioned instance of protected conduct bears a causal relationship to the adverse employment action(s) alleged herein.

102.    As a result of the Abbott's whistleblower retaliation, Mayhew has suffered and is entitled to damages, including but not limited to: lost wages and

benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, civil penal damages, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Jessica Mayhew requests that the Court award her damages in the form of lost back pay, front pay, compensatory damages, civil penal damages, punitive or liquidated damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

### JURY TRIAL DEMAND

Plaintiff Jessica Mayhew hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated: February 3, 2025

/s/ Laura H. White

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com

/s/ Danielle Quinlan

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
dquinlan@whiteandquinlan.com

20